IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| DEEDRA WATSON,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>        Defendant. | CASE NO. 1:23-cv-1952<br><br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Plaintiff Deedra Watson filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits. This court has jurisdiction under 42 U.S.C. §§405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 4. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural Background**

In September 2020, Watson filed an application for Disability Insurance Benefits alleging a disability onset date in April 2020.[1] Tr. 65. In pertinent part, Watson alleged that she was disabled and unable to work due to her

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

arteriovenous malformation[2] ("AVM") and "scalp wounds." Tr. 65. The Commissioner denied Watson's application initially and on reconsideration. Tr. 85, 92.

In January 2022, Watson requested a hearing. Tr. 96. Administrative Law Judge ("ALJ") Genevieve Adamo held a telephonic hearing in August 2022. Tr. 125. Watson appeared, testified, and was represented by counsel at the August 2022 hearing. Tr. 37. Qualified vocational expert Melanie Frye also testified. Tr. 37. In October 2022, the ALJ issued a written decision, which found that Watson was not entitled to benefits. Tr. 14–36.

In October 2022, Watson appealed the ALJ's decision to the Appeals Counsel. Tr. 158. In August 2023, the Appeals Counsel denied Watson's appeal, making the ALJ's October 2022 decision the final decision of the Commissioner. Tr. 1–6; *see* 20 C.F.R. § 404.981.

Watson timely filed this action in October 2023. Doc. 1. In her opening brief, she asserts the following legal issue:

> WHETHER THE ADMINISTRATIVE LAW JUDGE ERRED IN HER EVALUATION OF THE PLAINTIFF'S COGNITIVE DEFICITS AND FATIGUE RESULTING FROM HER ARTERIOVASCULAR MALFORMATION RUPTURE AND HEMORRHAGE.

---

[2]     An AVM is a tangle of blood vessels that irregularly connect an individual's arteries and veins, disrupting the flow of blood and circulation of oxygen. If an AVM in the brain ruptures, it can cause a brain bleed, stroke, or brain damage. MAYO CLINIC, DISEASES & CONDITIONS, *Arteriovenous malformation*, https://www.mayoclinic.org/diseases-conditions/arteriovenous-malformation/symptoms-causes/syc-20350544 **[https://perma.cc/Y7TZ-HJVM]**.

Doc. 9, at 1.

**Evidence**

  *1.  Personal and Vocational Evidence*

  Watson was born in 1987, making her 32 years old as of her alleged onset date. Tr. 32, 164. She completed high school and college. *E.g.*, Tr. 46. She also has past relevant work experience as a general duty nurse, nurse assistant, administrative clerk, and salesclerk. Tr. 59–60.

  *2.  Medical Evidence*[3]

  Watson has had an AVM since birth. *E.g.*, Tr. 365. In May 2020, Watson underwent emergency surgery when she experienced an AVM rupture in her right cerebellar area, which caused a brain hemorrhage. Tr. 345, 365. Throughout May and June of 2020, Watson underwent multiple surgeries to repair the damage caused by her AVM rupture, including a suboccipital craniectomy for posterior fossa decompression (removal of part of the skull to create room for the brain and spinal cord)[4] and placement of an external ventricular drain. Tr. 345. Throughout June and July 2020, Watson underwent subsequent wound revision surgeries due to cerebrospinal fluid leaks and wound breakdown, as well as an infection in a shunt that her surgeon had

---

[3]     The recitation of medical evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs.

[4]     https://www.saintlukeskc.org/health-library/posterior-fossa-decompression [**https://perma.cc/6X2R-ABTF**].

placed in her. Tr. 351. Watson was officially released from inpatient care in July 2020. Tr. 439.

In August 2020, Watson had a surgery follow-up appointment during which, her provider noted that she had normal motor bulk and tone, full strength in her extremities, symmetrical reflexes, and no sensory deficits. Tr. 362. Watson described daily headaches and blurred vision, with an occasional lazy eye. Tr. 359. She also described occasional constipation and numbness in her right hand. Tr. 359–60. She did, however, also state that her nausea and vomiting, though present, were decreased. Tr. 359.

In September 2020, Watson was evaluated following complaints of left eye problems. Tr. 434. In December 2020, Watson followed-up with an ophthalmologist for vision changes and trouble with visual tracking. Her provider noted that  there was no indication of intracranial pressure elevation and Watson was expected to continue to recover. Tr. 434.

In January 2021, Watson participated in a physical consultative examination with Craig Hermann, D.O. Tr. 365–74. Dr. Herman noted Watson's history of brain hemorrhage and that Watson complained of right-sided weakness, altered thought process, an inability to walk, and double vision. Tr. 365. On examination, Watson was alert and had good eye contact, fluent speech, clear thought processes, and appropriate mood. Tr. 367. Her memory was normal, and concentration was good. Tr. 367. She had an asymmetric gait, but she did not use an assistive device; good hand-eye

4

coordination; normal finger to nose and heel to shin testing; and negative Romberg sign. Tr. 367. Watson's straight-leg-raise tests were negative; her sensory examination was normal to light touch throughout; and her fine and gross manipulative abilities were grossly normal. Tr. 368. She was able to squat and rise with moderate difficulty, rise from a sitting position without assistance, get up and down from the exam table with ease, and walk on heels and toes with ease. Tr. 368. Watson had weakness in her right arm and leg compared to the left and she had some decreased finger strength, but she had normal dexterity in her right hand. Tr. 369. Dr. Herman found that Watson had no limitations with sitting, mild limitations with standing, walking, and lifting due to her right-side weakness and balance problems, no need for an assistive device, no limitations in reaching, grasping, handling, fingering, or feeling, and no communicative or environmental limitations. Tr. 369. Dr. Herman did note, however, that Watson had visual limitations due to her double vision. Tr. 369.

In March 2021, Watson stated in an optometry visit that her double vision had "improved greatly," and her provider noted that her vision was stable with had no eye pain, irritation, or redness. Tr. 436. Her provider opined that Watson did not need surgery and recommended a follow-up appointment in four to six months. Tr. 438.

In April 2021, Watson began neuropsychological rehabilitation. Tr. 439. Watson described fatigue from physical and mental effort, balance and

coordination issues, noise sensitivity, but not light sensitivity, occasional headaches, and difficulty with visual tracking. Tr. 439–440. Watson's provider noted that she had both "no complaints" in her "attention/working memory" and reduced memory and learning abilities. Tr. 440. Her provider also noted that Watson had a low mood, reduced confidence, "slowed and effortful processing," greatly reduced mental energy, and issues with her executive functions. Tr. 440.

Watson received neuropsychological rehabilitation weekly from May 2021 through January 2022. *E.g.*, Tr. 442, 444, 446, 448. During her visits, Watson described continued fatigue, difficulty controlling her anger, low motivation, emotional dysregulation, word-finding problems, and slowed mental functions. Tr. 442, 444, 446, 448. Watson discussed her moods and memory loss resulting from her brain injury and further discussed the techniques that she developed to combat fatigue and frustration. Tr. 446, 464.

In June 2021, Lindsay Miller Scott, Ph.D. performed a neuropsychological assessment in the context of Watson's ruptured AVM. Tr. 450. Watson reported memory issues, slowed thinking and reaction speed, fatigue, and vision changes. Tr. 451. Dr. Scott described Watson as visibly fatigued, with slow testing pace and low mental stamina. *Id*. Dr. Scott's testing showed severe impairments to: processing speed, word reading, and color identification; cognitive set shifting, learning unstructured nonverbal information, and delayed free recall. Tr. 453–54. Testing also showed moderate

6

to severely impaired recognition discrimination, moderately impaired letter fluency, and mildly impaired semantic fluency. Tr. 453–54. Watson's fine motor dexterity was mild to moderately impaired in her right dominant hand and low or average in her left hand. Tr. 454. Dr. Scott identified impairments to Watson's memory and cognitive abilities and recommended that she continue cognitive monitoring. Tr. 454. Dr. Scott had the diagnostic impression that "it would be prudent" for Watson "to remain off work for now" in light of her "observed cognitive difficulties and notable fatigue[.]" Tr. 454. But Dr. Scott's "RECOMMENDATIONS" did not include a recommendation to remain off work for any particular period of time. Tr. 454–56.

In March 2022, a CT scan showed no abnormal enhancement that would suggest a reoccurrence of Watson's AVM and the overall appearance of Watson's brain was similar to her December 2020 study. Tr. 595–96.

### 3. State Agency Consultants

In February 2021, state agency consultant Lynn Torello, M.D., found that Watson's residual functional capacity[5] ("RFC") was limited to a work reduced range of light work. Tr. 67–69. Dr. Torello found that Watson was limited to occasionally lifting, carrying, and pulling 20 pounds; frequently lifting, carrying, and pulling 10 pounds; standing or walking for no more 4-

---

[5]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

hours and sitting for 6-hours out of an 8-hour workday; frequent pushing, pulling, and use of pedal controls with her right arm and leg; and, frequent handling and fingering with her right hand. Tr. 67–68. Dr. Torello further limited Watson to frequent balancing, stooping, and kneeling; occasional climbing ramps and stairs, crouching, and crawling; and never climbing ladders, ropes, or scaffolds. Tr. 68. Dr. Torello also found that Watson should avoid exposure to hazards including dangerous machinery or unprotected heights. Tr. 69. Watson did not allege psychological impairments on initial review and thus Dr. Torello made no assessment of Watson's mental RFC at that time. Tr. 65–70.

State agency consultants completed reconsideration in November 2021. Tr. 81. State agency reviewing psychologist Paul Tangeman, Ph.D., considered Watson's alleged mental impairments of depression and neurocognitive disorders. Tr. 79–80. In October 2021, Dr. Tangeman found that Watson was limited to: understanding and remembering simple one to two step tasks; sustaining concentration and persistence to complete one to two step tasks; occasional intermittent interaction with others; and, simple routine tasks with regular expectations and few changes. Tr. 79–80. In November 2021State agency reviewing physician Scott Bolz, M.D., affirmed the findings of Dr. Torello, with regard to Watson's physical RFC. Tr. 77–79.

*1. Hearing Testimony*

Watson, who was represented by counsel, testified in a telephonic hearing in August 2022. Tr. 37–56. Watson testified that she lived in a two-story house with her husband, children, and grandmother-in-law. Tr. 44. She stated that she had a driver's license and could drive but hadn't "driven on the freeway yet." Tr. 45. Watson explained that she had problems driving due to her poor peripheral vision. Tr. 45.

Watson testified that she completed her bachelor's degree and most recently worked as a general duty nurse with University Hospitals until May 2020, when her AVM ruptured. Tr. 46. She lifted approximately 50 to 80 pounds in her role as a general duty nurse. Tr. 46. Watson also explained that she also previously worked as a nurse in a nursing home, as a nurse's aide, in a secretarial role for a research office, and at a grocery store. Tr. 47.

Watson stated that she was not currently seeking employment and, when asked why she believed she could not work, she explained that:

> I think that the biggest thing is just my frequent –
> just my tiredness, and then obviously just my
> memory issues. In like articulating stuff, like I know
> what I want to say but it's just, it's hard for me to
> like say it so I – and I just think that's all just related
> to my brain just healing and just – it's gotten better
> but I just need time, I think. So the biggest thing is,
> yeah -- … Just I think that the biggest thing is just
> my tiredness, my frequent lethargy and just my
> memory issues, those are probably the biggest.

Tr. 48. She further described that she did not "have a problem remembering like important things, like I remember my name and my kids' names and all

9

that, and birthdays and all that. But it's just like, you know, daily details or whatever." Tr. 49. Watson later described that her depression has a "huge impact" on her ability to work and her relationships. Tr. 51. She also explained that she was sensitive to light, experienced headaches, and had bouts of nausea. Tr. 53–55.

When asked whether she would have problems remembering what to do in a simple job where she was doing the same thing all day, Watson stated "I don't know that I would have problems remembering. Just like I just, it's frustrating to like function like that, you know, with – I – no, I don't think I would do well with that." Tr. 50.

Watson testified that she is able to take care of her children and herself, cook meals, and do chores but that it takes more time. Tr. 50. She further stated that her grandmother-in-law will help, sometimes by helping with laundry or taking her children to the park. Tr. 50. Watson later clarified that after her AVM ruptured, she had people with her at all times, but as she has recovered she has not required such constant monitoring and her grandmother-in-law moved in as she began to recover. Tr. 53.

2. *Vocational Expert Testimony*

Qualified vocational expert Melanie Frye also testified at the August 2022 telephonic hearing. Tr. 56–64. Frye classified Watson's past work as

follows: general duty nurse, DOT[6] 075.364-010; nurse assistant, DOT 355.674-014; administrative clerk, DOT 219.362-010; and salesclerk, DOT 290.477-014. Tr. 59–60.

The ALJ posed the following hypothetical to Frye:

> [An] individual with the same age and education as the claimant and with the past jobs you described, who can occasionally lift and/or carry 20 pounds, 10 pounds frequently, stand and/or walk for four hours, sit for six hours. Could perform frequent pushing and pulling with the right upper extremity and right lower extremity.
>
> Frequent use of pedals or foot controls with the right lower extremity, and never climbing ladders, ropes or scaffolds, occasionally climbing rams and stairs, crouching, balancing and crawling, frequent stooping and kneeling, frequent handling and fingering with the right upper extremity, must avoid unprotected heights, commercial driving and dangerous machinery with unprotected moving mechanical parts.
>
> Can understand, remember and carry out simple instructions and retain competitive tasks. Cannot perform work requiring a specific production rate such as assembly line work. Can meet production requirements, allow flexible and goal-oriented pace. Can obtain the focus, persistence, concentration, pace and attention to engage in such tasks for two-hour increments for eight-hour workdays within the confines of normal work breaks and lunch periods.
>
> Work should generally not require changing tasks from day to day, but rather there should be a fairly regular set of job duties and expectations with changes explained. Could tolerate occasional interaction with supervisors, coworkers and the

---

[6]     DOT stands for the Dictionary of Occupational Titles. It is a standard classification of occupations established by the Social Security Administration.

general public, but contacts still include what's necessary for general instruction, task completion or training, but could not perform tandem tasks.

Tr. 60–61.

Frye stated that the hypothetical individual would not be able to perform any of Watson's past work. Tr. 61. Frye testified that there would be other jobs available in the national economy, however, and she described those available jobs. Tr. 61.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act though December 31, 2025.

2. The claimant has not engaged in substantial gainful activity since April 1, 2020, the alleged onset date (20 CFR 404.1571, *et seq*.).

3. The claimant has the following severe impairments: arteriovenous malformation rupture; visual disturbances; obesity; cognitive impairment; and depression (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can occasionally lift and or carry 20 pounds, 10 pounds frequently; stand and/or walk for 4 hours, sit for 6 hours; frequently push/pull with the right upper and right lower extremities; frequent use of pedals or foot

12

controls with the right lower extremity, never climb ladders, ropes of scaffolds; occasionally climb ramps and stairs; occasional couching, balancing, and crawling; frequent stooping and kneeling; frequent handling and fingering with the right upper extremity, must avoid unprotected heights, commercial driving, and dangerous machinery with unprotected moving mechanical parts; can understand, remember, and carry out simple instruction and routine repetitive tasks; cannot perform work requiring a specific production rate, such as assembly-line work; can meet production requirements that allow a flexible a goal-oriented pace; can maintain the focus, persistence, concentration, pace, and attention to engage in such tasks for two-hour increments, for eight-hour workdays, within the confines of normal work breaks and lunch periods; work should generally not require changing tasks from day to day but rather there should be a fairly regular set of job duties and expectations with changes explained; could tolerate occasional interaction with supervisors, coworkers, and the general public, but contact still includes what is necessary for general instruction, task completion, or training; and cannot perform random tasks.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on September 24, 1987 and was 32 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education (20 CFR 404.1564)

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job

skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 040.1569a)

11.   The claimant has not been under disability, as defined in the Social Security Act, from April 1, 2020, through the date of this decision (20 CFR 414.1520(g)).

Tr. 19–33.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.   Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.   Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

14

3.      Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.      What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.      Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."

15

*Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

## Analysis

### *Watson's Issue Presented*

At first glance, it appears that Watson raises just one issue for consideration on appeal. Doc. 9, at 1. On a fuller examination, however, it is

16

apparent that Watson takes issue with multiple aspects of the ALJ's decision. *See e.g.*, Doc. 9, at 10, 15. Watson, through counsel, has taken an approach to briefing that is not encouraged. The Court, however, has identified the substance of Watson's arguments and addresses them in turn as presented under the respective subheadings.

*Watson's First Subheading*

Watson appears to initially argue that the ALJ improperly considered all of the evidence of record by cherry-picking certain evidence and because she devalued other evidence. Doc. 9, at 12 (stating that the ALJ "failed to consider all of Ms. Watson's asserted limitations, and then omitted discussion of certain evidence"). This argument is without merit. Watson does not appear to dispute that the ALJ considered all of the evidence of record. Doc. 9, at 12. Rather, Watson appears to take issue with the ALJ's weighing of the evidence–both her subjective complaints and the medical evidence. Doc. 9, at 12. Specifically, Watson argues that the ALJ omitted discussion of certain evidence and "devalued Ms. Watson's statements regarding what most impacts her ability to work." *Id*. Watson says, without citation to the ALJ's decision, that the ALJ failed to consider her symptoms of fatigue. Instead, Watson cites various portions of her testimony in which she described her fatigue and related symptoms. *Id*. Including these citations does not show that the ALJ failed to consider them. *Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661, 665 (6th Cir.

2004) ("An ALJ need not discuss every piece of evidence in the record for [her] decision to stand.").

And the ALJ explicitly stated that she considered the entire record. The Court presumes that to be true absent a showing to the contrary. *E.g.*, Tr. 19; *see NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 163 (2d Cir. 2021); *see also United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."). Watson has made no argument refuting the ALJ's statement. Further, the ALJ's discussion of the evidence shows that she *did* consider Watson's statements regarding fatigue. *See e.g.*, Tr. 22 (recognizing that Watson has asserted "difficulties managing her mood, reporting mood swings, depressed mood, low energy, and fatigue"); Tr. 23 (identifying evidence in physician's notes and hearing testimony which showed that Watson experienced significant, daily fatigue and other difficulties including with concentration); Tr. 28 (summarizing that although Watson "reported ongoing issues with fatigue, low mood, low energy, cognitive and processing deficits ... she also reported improvement with time and stated she is able to perform her daily activities" albeit at a slower pace).

To the extent that Watson also argues that the ALJ did not "engag[e] in whether the symptoms were supported and would effect Plaintiff's sustainability at any potential job," Doc. 9, at 12, Watson's brief belies her

argument. Her brief shows that the ALJ did engage with the symptoms that she described. Doc. 9, at 12 (citing the ALJ's decision). Watson's argument demonstrates that Watson simply disagrees with the weight the ALJ afforded certain evidence. Such disagreement does not support remand because weighing the record evidence is precisely what the ALJ is tasked to do. 20 C.F.R. § 404.1520c(a) (explaining how the ALJ will consider and weigh medical opinions and prior administrative medical findings); *see also Gill v. Comm'r of Soc. Sec.*, No. 1:22-cv-00981, 2023 WL 4078193, * 16 (N.D. Ohio April 24, 2023) ("[T]his court does not weigh evidence, assess credibility, or resolve conflicts in testimony–that's the ALJ's job.") (quoting *Rottman v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 196 (6th Cir. 2020)).

Relatedly, Watson appears to argue that the ALJ erred in her consideration of Watson's ability to complete non-work activities, because the ALJ did not "determine how many hours or how much effort was being expended on these activities[.]" Doc. 9, at 12. In support of this argument Watson cites district court cases which, Watson claims, support the idea that an individual's "ability to perform some activities on a limited basis is not substantial evidence that her symptoms are not disabling." Doc. 9, at 13. In addition to not binding this Court, the cases cited offer little support for Watson's argument that the ALJ erred. In particular, Watson highlights *Lorman v. Comm'r of Soc. Sec.*, 107 F. Supp. 3d 829, 838 (S.D. Ohio 2015), to argue that there is a difference between the household and daily tasks that

19

Watson can complete and working 40 hours per week. Doc. 9, at 13. That statement is not in dispute. In fact, the ALJ was quite conscious of this fact in assessing an RFC for light work that accounted for several functional limitations. Tr. 31 (explaining the various limitations contained with Watson's RFC and explaining that her "fatigue" and "cognitive impairment" – among other conditions – "support limiting the claimant to no more than light exertion, with additional limitations … [including] the routine nature of tasks, production and time demands, workplace changes, and the nature and frequency of interactions with others[.]"). Contrary to Watson's argument, the ALJ did not find that Watson could perform an unlimited range of "work 40 hours a week for 52 weeks per year." Doc. 9, at 13 (citing *Lorman*, 107 F. Supp. 3d at 838).

Further, the cases cited by Watson do not negate the fact that it is within the ALJ's discretion to weigh the evidence to determine what limitations are appropriate. *See Gill*, 2023 WL 4078193 at *16. For Watson to show that the ALJ's decision was not supported by substantial evidence, she must show that there was no relevant evidence that "a reasonable mind might accept as adequate to support" the ALJ's conclusion. *See Beistek*, 139 S. Ct. at 1155 (quoting *Consolidated Edison Co. v. NLRB*, 305 U. S. 197, 229 (1938). The fact that Watson can point to evidence that demonstrated fatigue and cognitive issues, does not mean that the ALJ failed to consider that evidence or that the

ALJ's decision was unsupported by substantial evidence. *See Jones*, 336 F.3d at 477.

Also contained within Watson's first subheading is an argument that the ALJ "played doctor" and committing reversable error by characterizing as "conservative" Watson's treatment over a period of time. Doc. 9, at 13–15; Tr. 27.[7] To this end, Watson argues that her "treatment was not necessarily conservative" and that "the ALJ[] is hardly a physician who offers alternative surgical treatment."[8] Doc. 9, at 14. That the ALJ here described the course of treatment after July 2020 "conservative" does not amount to playing doctor. Indeed, the cases cited by Watson do not support the idea that such a statement could amount to playing doctor.

Watson cites *Henderson v. Comm'r of Soc. Sec.*, No. 1:20-cv-1712, 2021 WL 7251999, at *9 (N.D. Ohio Oct. 27, 2021), *report and recommendation adopted*, 2022 WL 627034 (N.D. Ohio Mar. 3, 2022), in support of her argument that describing treatment as "conservative" is "fraught with error." Doc. 9, at

---

[7]    In various medical records, cited by the ALJ in her decision (Tr. 27), Watson's medical providers described a course of "conservative treatment" when assessing whether shunt exploration or "conservative treatment" were appropriate. *E.g.*, Tr. 275, 329. This indicates that, in addition to the generally accepted use of the phrase "conservative treatment" discussed above, the ALJ was reasonably using this phrase as directly in reference to the medical records she cited.

[8]    One might think that if the ALJ "played doctor" when she characterized Watson's course of treatment as conservative, then Watson's argument that her "treatment was not necessarily conservative or proven to be conservative," Doc. 9, at 14, presents a similar concern.

14. That case, however, is not controlling and is distinguishable. In *Henderson*, the Court found that the ALJ's statement that treatment was conservative was inconsistent with the record and the ALJ erred by failing to articulate that surgeries were no longer advised because they would cause more rapid spinal degeneration. 2021 WL 7251999 at *9. Here, unlike in *Henderson*, the ALJ described a non-surgical course of treatment, which Watson's own physicians also described as conservative. Tr. 27. Watson does not respond to the Commissioner's argument that courts in the Sixth Circuit generally describe non-surgical treatment as "conservative." Doc. 12, at 10.

Watson also cites several cases, including *Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006), for the general proposition that it is not the ALJ's role to make medical judgements or substitute their medical opinion for that of a medical professional. Doc. 9, at 14. These cases do not advance her argument that the ALJ in this case "played doctor." Instead, they identify case-specific conduct, which Watson does not allege occurred here, that was deemed impermissible. For example, in *Meece*, the Sixth Circuit found that the ALJ improperly substituted his own medical judgment for that of the treating physician by reasoning that use of over-the-counter medication showed pain was less severe than alleged, where the record showed both prescription and non-prescription pain medication were administered. *Meece*, 192 F. App'x. at 465. As far as the Court can tell, Watson has not alleged that the ALJ

substituted her own medical judgment to inaccurately describe the course of Watson's treatment, nor would such an argument be supported by the record.

Watson also makes a passing argument that the ALJ "second guessed" Watson's providers and her testimony. Doc. 9, at 15. Watson provides no record support for this assertion. She has therefore, forfeited this argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

*Watson's Second Subheading*

Watson's second argument appears to be that the ALJ erred by assessing an RFC of "light work, without adding or accounting for fatigue and cognitive deficits[.]" Doc. 9, at 15. In support of this argument, Watson simply recites, with certain emphasis, the ALJ's RFC finding and then cites cases that stand for the proposition that an ALJ must consider all of the evidence in the record. Doc. 9, at 16–17. As discussed above, the ALJ stated that she considered all of the evidence and Watson has not made any contrary showing. In fact, Watson recognizes that "[t]he ALJ did include a cursory limitation of simple and routine tasks, and occasional interactions with others[.]" Doc. 9, at 17. It appears, however, that Watson disagrees with the ALJ's finding because

she claims that "the ALJ failed to effectively identify the functional impact of the cognitive deficits and fatigue." Doc. 9, at 17.

The theme of this argument appears to originate from Watson's belief that the record shows that her RFC should have included "more profound cognitive limitations and fatigue issue[s]." Doc. 9, at 17. In support of her position, Watson points to her testimony and medical records, specifically the opinion of Dr. Scott, to support her contention that more significant limitations were appropriate. *See* Doc. 9, at 17–18. But the fact that Watson can point to evidence to support an RFC with greater limitations does not change the fact that the ALJ's RFC assessment is supported by substantial evidence. *See Jones*, 336 F.3d at 477. And, as Watson admits, the ALJ did include limitations that account for her fatigue and cognitive capabilities. The record shows that Watson underwent a significant medical event, and related surgeries immediately thereafter, which have affected her current capacity for work. None of Watson's arguments, however, demonstrate that the ALJ erred in her assessment of the entire record or in her ultimate finding that jobs within Watson's current capacity to work existed in significant numbers. Remand is, thus, not warranted here.

As a final argument, Watson asserts that "the ALJ relied on a hypothetical which did not fully consider Ms. Watson's allegations and important record evidence." Doc. 9, at 18. Watson, however, does not explain what, precisely, is problematic about the ALJ's hypothetical or what evidence

24

the ALJ failed to incorporate in it. Instead, she simply states the proposition that the ALJ's hypothetical "must accurately portray a claimant's physical and mental impairments." *Id*. But that proposition doesn't show that the ALJ erred or that her hypothetical was flawed. This undeveloped argument is thus forfeited.

**Conclusion**

For the reasons explained above, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated: April 29, 2024

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge
